UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

J & J SPORTS PRODUCTIONS, INC.,      )
                                     )
         Plaintiff,                  )
                                     )        No. 5:14-CV-440-REW
v.                                   )
                                     )        MEMORANDUM OPINION AND
MANFRED JASCHKOWITZ, et al.,         )               ORDER
                                     )
         Defendants.                 )

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The parties filed cross-motions for summary judgment. DE ##22 (Defendants'

Motion); 25 (Plaintiff's Motion). Each side responded. DE ##27 (Plaintiff's Response);

28 (Defendants' Response). Plaintiff replied, DE ##29, 30, but Defendants did not. The

motions are ripe for consideration. For the following reasons, the Court **GRANTS IN**

**PART** and **DENIES IN PART** each motion (DE ##22 and 25). Defendants are entitled

to summary judgment regarding state law conversion and § 553. Plaintiff proves its

entitlement to relief under § 605 as to both Defendants.

I.      BACKGROUND

On December 8, 2012, Manny Pacquiao fought Juan Manuel Marquez for the

World Boxing Organization Welterweight Championship.[1] J & J Sports alleges that it

purchased and held the commercial exhibition licensing rights to broadcast this program

domestically (including undercard bouts, as defined in Complaint ¶ 16). *See* DE ##1

(Complaint), at ¶ 16; 25-2 (Gagliardi Affidavit), at ¶ 3. J & J Sports contends that

---

[1] Marquez "floored Pacquiao" with a knockout punch in the sixth round. *See Juan Manuel Marquez Knocks Out Manny Pacquiao in Sixth Round*, BBC Sport (Dec. 9, 2012), http://www.bbc.com/sport/boxing/20630465 (last visited Dec. 7, 2015).

Defendants, without authorization and without purchasing a commercial license permitting program broadcast, intercepted, received, published, divulged and/or exhibited the program at Kawama (a karaoke bar) on Winchester Road in Lexington. DE ##1, at ¶ 19; 25-2, at ¶ 7. Inspector Keebortz states via affidavit that he entered Kawama at approximately 10:39 p.m. on December 8, 2012, and observed one television displaying an applicable undercard bout. DE #25-3 (Keebortz Affidavit); *see also* DE #25-2, at ¶ 7.

Defendants deny allegations of wrongdoing but admit that a bartender's boyfriend showed the Program "in a delayed manner from the Internet by using a smart phone connected to the projection television in Kawama." DE #22-3 (Defendants' Responses to Interrogatories), at 3; *see also id.* at 4 (stating that David Redondo, boyfriend of bartender Rosa Alfaro, "brought his friends to Kawama where he attached a smart phone to the projection television and allowed his friends to watch a time delayed version of the Program."). Each side claims a right to judgment.

## II.     STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical or determinative. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita*

*Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

### III.   ANALYSIS

   A.   *Statutory Liability*

   [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, . . . to any person other than the addressee, his agent, or attorney . . . . No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a).[2] The statute applies centrally (but not exclusively) to satellite transmissions. *Cablevision of Mich., Inc. v. Sports Palace, Inc.*, 27 F.3d 566, 1994 WL 245584, at *3 (6th Cir. 1994) (table); *J & J Sports Prods., Inc. v. Castillo*, No. 13-cv-377-KSF, 2014 WL 1281478, at *2-*3 (E.D. Ky. Mar. 27, 2014). It is a strict liability statute,

---

[2] J & J Sports also discusses § 553 in its summary judgment brief before confirming that it only "seeks judgment pursuant to 47 U.S.C. § 605." DE #25-1, at 8. The Court thus cabins its analysis to § 605, **DENIES** DE #25 and **GRANTS** DE #22 as to Count II of the Complaint. Plaintiff, as a matter of election, abandoned the claim. *See, e.g.*, *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

although "intent is relevant to the calculation of plaintiff's remedies[.]" *Joe Hand Promotions, Inc. v. Easterling*, No. 4:08 CV 1259, 2009 WL 1767579, at *4 (N.D. Ohio June 22, 2009) (internal quotation marks removed).

"Any person aggrieved by any violation of subsection (a) of this section . . . may bring a civil action in a United States district court[.]" 47 U.S.C. § 605(e)(3)(A). Section (d)(6) defines "any person aggrieved." J & J Sports plainly falls under the definition here. *See Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 912-13 (6th Cir. 2001) ("By adding satellite communications under the protection of § 605 . . . Congress sought to make clear that those with 'proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming,' 47 U.S.C. § 605(d)(6), have standing to sue."). J & J Sports's proprietary right in commercial distribution of the Program is not disputed on this record.

The Sixth Circuit has described the broad scope of § 605: it "defines what constitutes the unauthorized publication or use of electronic communications. It includes such prohibited practices as the *divulgence* of wire or radio communications by persons authorized to receive them to others who are not so authorized, and the interception of any radio communication by a person not authorized to receive that communication from the sender." *Eliadis*, 253 F.3d at 907 (emphasis added). Indeed, "the prohibition in the first sentence of § 605(a) does not involve the interception of a communication at all. It prohibits intermediaries who are authorized to receive a communication by wire or radio from divulging the contents of the transmission to any person other than the addressee intended by the sender." *Id.* at 913. The Court of Appeals distinguished prior cases and determined that a § 605 violation does not require joint communication interception and

5

divulgence. *Id.* at 913-14 ("The statements from *Smith* and *Bufalino* that purportedly limit the scope of § 605 are thus overly broad, taken out of context, and therefore not definitive in determining the applicability of § 605 to the present circumstances."). Simple unauthorized divulgence of a qualifying transmission suffices under § 605(a) sentence one.

"Section 605(a) prohibits the unauthorized divulgence of a satellite communication, even after lawfully receiving the communication, to unauthorized recipients, such as patrons." *DIRECTV, LLC v. Perugini*, 28 F. Supp. 3d 351, 355 (M.D. Pa. 2014) (internal quotation marks removed). Further, "no interception is required [to find liability] since the third sentence simply proscribes the unauthorized divulgence or publishing of covered communications even when they have been received legally." *Id.* (internal quotation marks removed). The Sixth Circuit has told lower courts that "the absence of an 'interception' does not get [a defendant] off the hook of § 605." *Eliadis*, 253 F.3d at 915.

Further, and critically here, *Eliadis* clarified that *Cablevision*'s statement that when there is "no interception, the mere fact that the bar divulged or published [a] fight cannot make it liable under Section 605(a)," *see* 27 F.3d 566, 1994 WL 245584, at *4 (internal quotation marks and alterations omitted), "is not a correct statement of the law." 253 F.3d at 915. Instead, "[a]n authorized intermediary of a communication . . . violates the first sentence of § 605(a) when it divulges that communication through an electronic channel to one 'other than the addressee' intended by the sender[.]" *Id.* at 916. The central finding in that case leading to liability was the following: "that Time Warner had improperly divulged the communication of the event to the Melody Lane Lounge, an

6

'addressee' that was not authorized by Main Events to receive it from Time Warner." *Id.*
The Sixth Circuit "conclude[d] that even though Time Warner did not intercept the
communication in question, it nonetheless divulged the telecast of the event to an
unauthorized addressee in violation of the first sentence of § 605(a)." *Id.* "Because the
Melody Lane Lounge was not authorized by Main Events to receive the transmission of
the event from Time Warner, Time Warner has violated the prohibitions of the first
sentence of § 605(a)." *Id.* at 917. Other district courts have followed suit. *See, e.g.*, *J & J
Sports Prods, Inc. v. Orellana*, No. H-11-0574, 2012 WL 3155728, at *4 (S.D. Tex. Aug.
2, 2012) ("Any unauthorized showing of the Event is a violation[.]"; "The FCA is a strict
liability statute, so a plaintiff, as exclusive licensee, need only show that the Event was
shown in the defendant's establishment without the plaintiff's authorization."); *Nat'l
Satellite Sports, Inc. v. Garcia*, No. Civ.A. 301CV1799D, 2003 WL 21448375, at *1 n.2
(N.D. Tex. June 18, 2003) ("A tape-delayed broadcast without authorization is still a
violation of the FCA."); *J & J Sports Prods., Inc. v. Mosqueda*, No. CV-12-0523 PHX
DGC, 2013 WL 2558516, at *2-*3 (D. Ariz. June 11, 2013) (same); *That's Entm't, Inc. v.
J.P.T., Inc.*, 843 F. Supp. 995, 999 (D. Md. 1993).

This case involves the novel application of somewhat dated statutes (and cases) to
the smart phone age. Plaintiff puts forward no proof of Defendant Red Ruby Properties,
LLC d/b/a Kawama's ("Kawama") direct interception of the Program. Indeed, Inspector
Keebortz's affidavit swears to nothing more than Program *display* on one television.
Rather, Defendants supply the (unopposed) detail: that Mr. Redondo, Kawama bartender
Alfaro's boyfriend, attached his smart phone to the television to show (a delayed version
of) the Program. The phone evidently accessed the fight via an unknown Internet site. DE

#25-4, at Answer 6. The intended audience apparently was Redondo's friends, but the Program was plainly also visible to other bar patrons. Keebortz, present in the bar that night, swore to viewing it, although he was unable to hear it because karaoke music was "up too loud." DE #25-3, at 3.

Although the Court can find (and the parties identified) no case directly addressing this factual situation, application of the above principles resolves the § 605 claim against Kawama in J & J Sports's favor. Sentence one directly proscribes the unauthorized "divulge[nce] or publi[cation of] the existence, contents, substance, purport, effect, or meaning" of an "interstate . . . communication by wire or radio" after "receiving" such a communication, with an exception not applicable here. 47 U.S.C. § 605(a).[3]

Kawama divulged or published a received wire communication in violation of § 605 when it permitted Redondo to enter the establishment, plug his smart phone (which was connected to the Internet) into the projection television, and display the Program in a manner visible to bar patrons.[4] Even if Redondo had personal permission or authority to

---

[3] Defendants do not contest that an Internet transmission like the one at issue here qualifies as an interstate communication by wire. *See, e.g.*, *United States v. Napier*, 787 F.3d 333, 346-47 (6th Cir. 2015) (finding that emails transmitted over the Internet "were transmitted through interstate wires"); *United States v. Drummond*, 255 F. App'x 60, 64 (6th Cir. 2007) (assuming that Internet-based transactions were "wire communications"); *see also In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 508 (S.D.N.Y. 2001) (Internet access "provides to users . . . the ability to send or receive wire or electronic communications[.]"). The central thesis of the defense is that Plaintiff showed neither a cable or satellite component to the transmission, but the § 605(a) sentence one formulation extends to improperly divulged satellite or wire communications. A display via Internet connection, which is what the record here shows, would fall within the "wire" definition as detailed in the cases.

[4] The defense makes a cursory reference to state law *respondeat superior*, DE #28, at 4. The doctrine generally "provides the legal rationale for holding a master responsible for a tort committed by his servant." *Patterson v. Blair*, 172 S.W.3d 361, 363 (Ky. 2005). J & J

receive and view the Program on his smart phone (a question of which this record does not permit full analysis), Plaintiff demonstrates that Kawama did not have authorization to display the Program on its premises. Kawama, without authorization, after receiving or assisting in receiving[5] the Program via Redondo's smart phone, divulged or published the Program via projection television. This violates § 605. *Eliadis*, 253 F.3d at 915-17. Even if the smart phone broadcast was delayed in some manner and to some degree, this unauthorized publication remains a violation. *Garcia*, 2003 WL 21448375, at *1 n.2; *Mosqueda*, 2013 WL 2558516, at *2-*3.

Defendants make a final argument that J & J Sports lacks standing to sue because it did not fulfill pre-suit mechanics or file suit jointly with Top Rank, Inc. (TR), as allegedly required by certain contractual language. DE ##28, at 5-6; 28-1, at 4 ¶ 6 (applicable contract provision).[6]

The argument that J & J Sports lacks standing without TR's presence as a party lacks merit for the reasons stated in *J & J Sports Productions, Inc. v. 4326 Kurz, Ltd.*, No. 07-3850, 2009 WL 1886124, at *11-*12 (E.D. Pa. June 30, 2009) (interpreting identical contract language and concluding, "the agreement did not require plaintiff to join TR as a

---

Sports does not seek to hold Kawama liable for an Alfaro tort. Regardless, *respondeat superior* liability based on a servant's negligence is a viable theory. *E.g.*, *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 333-34 (Ky. 2014); *Southard v. Belanger*, 966 F. Supp. 2d 727, 745-46 (W.D. Ky. 2013); *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 440 (Ky. Ct. App. 1998). In any event, federal law defines the liability analysis here.

[5] Kawama provided a forum and location for the reception, provided a means of displaying the Program (the projection TV), and extended, via Kawama agents, the display to patrons.

[6] As Plaintiff protests, DE #30, at 6, the defense attached but did not authenticate the contract. *See* Fed. R. Evid. 901(a). Despite the sloppy presentation, sufficient indicia of reliability and expressions of authenticity exist for the Court to consider it as part of the overall case record. *See, e.g.*, DE #30, at 7 (Plaintiff referring to the attachment as "the contract between Plaintiff and Top Rank").

party to have standing to sue.") (attached as an exhibit by Defendants); *but see J & J Sports Prods., Inc. v. KSD, Inc.*, No. 3:12 CV 1873, 2014 WL 2807526, at *4 (N.D. Ohio June 20, 2014) ("[T]his Court cannot accord complete relief to all parties absent Top Rank's presence in the lawsuit."). Defendants made no joinder / Rule 19 argument or analysis (and had not stated such a defense), and the only case they cite differs from their argument on this point. *Kurz*'s analysis, viewing the contract provision as a whole, is more compelling than *KSD*'s, which isolated the single phrase "acting jointly" from the surrounding language and questionably interpreted it.[7]

However, *Kurz* did hold, despite TR not being a necessary plaintiff, based on the "acting jointly" and remaining clear ¶ 6 language, "that to have standing to bring this action plaintiff needed to have acted jointly with TR through notification in writing, consultation, and mutual agreement, as the agreement provides." 2009 WL 1886124, at *12. Because neither party in *Kurz* put forward evidence concerning whether J & J Sports satisfied this requirement, the court denied summary judgment to each. *Id.*[8]

This portion of *Kurz* was a contract interpretation decision. The court provided scant justification for its infringer-invoked contractual limitation on J & J Sports's standing conclusion, citing only two readily distinguishable cases. The Court thus independently analyzes whether J & J Sports, in this case, must demonstrate compliance

---

[7] Relevant Kentucky contract interpretation principles mirror Pennsylvania's (and other potentially applicable states'). *Compare Sadler v. Buskirk*, 478 S.W.3d 379, 382 (Ky. 2015) *and McMullin v. McMullin*, 338 S.W.3d 315, 320 (Ky. Ct. App. 2011)*, with LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009); *see also Kurz*, 2009 WL 1886124, at *11 nn. 12 & 13 (setting out general California and Nevada principles).

[8] J & J Sports here does not seriously respond to or grapple with this aspect of the defense's *Kurz* argument.

with ¶ 6's TR notification / consultation requirements[9] to bring this suit, and whether Defendants—the infringers—may use the paragraph as a shield from liability.

Because the question is one of contract interpretation, the Court first must determine the applicable choice of law rule:

> In a federal-question case [as here], the Court generally uses the choice-of-law principles of federal common law. *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001). However, **when the federal claim is based on the interpretation of state contract law, the forum state's choice-of-law principles apply**. *See, e.g.*, *Wise v. Zwicker & Assoc., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (applying Ohio choice-of-law in case involving FDCPA and related state law claims).

*See Stratton v. Portfolio Recovery Assocs., LLC*, ___ F. Supp. 3d ___, No. 5:13-147-DCR, 2016 WL 1092606, at *8 (E.D. Ky. Mar. 21, 2016) (emphasis added). Thus, in "federal question cases, a District Court entertaining pendent state claims should follow the choice of law rules of the forum state." *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996); *see also Invisible Fence, Inc. v. Fido's Fences, Inc.*, 687 F. Supp. 2d 726, 742 (E.D. Tenn. 2009) (applying Connecticut law to determine if third party may sue on the contract).

Accordingly, because Kentucky is the forum state, the Court applies Kentucky's choice-of-law rule to begin interpretation of the J & J Sports—TR contract. Kentucky applies the "most significant relationship" test of *Restatement (Second) of Conflict of Laws* § 188 to resolve contractual choice of law issues. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009); *see also, e.g.*, *Weingartner Lumber & Supply Co., Inc. v. Kadant*

---

[9] The contract provides that J & J Sports and TR "acting jointly[] shall have the right to commence or settle any claim or litigation arising out of the alleged piracy" and that they "shall notify each other in writing and shall consult with each other and mutually agree before commencing or settling any such claim or litigation[.]" DE #28-1, at ¶ 6. Any resulting damage awards shall "be shared by" both J & J Sports and TR. *Id.*

*Composites, LLC*, No. 08-181-DLB, 2010 WL 996473, at *3 (E.D. Ky. Mar. 16, 2010). Section 188(1) states: "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."[10] "Among the factors a court making that determination should consider are the place or places of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation and place of business of the parties." *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878-79 (Ky. 2013).

Courts have noted the generally provincial nature of Kentucky's choice of law rules. *See, e.g.*, *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) (noting the District Court's characterization of Kentucky's rules as "egocentric" and

---

[10]   The § 6(2) principles used to identify the state with the most significant relationship are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

[*Restatement*] § 6(2). When applying the § 6 principles, § 188(2) requires that courts consider the following contacts: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Asher v. Unarco Mat. Handling, Inc.*, 737 F. Supp. 2d 662, 669 (E.D. Ky. 2010).

having a "provincial tendency"); *Asher*, 737 F. Supp. 2d at 667 ("[A] strong preference

exists in Kentucky for applying Kentucky law."). "Kentucky's choice of law rules favor

application of its own law whenever it can be justified." *Johnson v. S.O.S. Transport,

Inc.*, 926 F.2d 516, 519 n.6 (6th Cir. 1991); *see also Louisville/Jefferson Cnty. Metro

Gov't v. Hornblower Marine Servs.-Ky., Inc.*, No. 3:06-CV-348-S, 2009 WL 3231293, at

*3 (W.D. Ky. Oct. 2, 2009) ("Kentucky courts apply their own law where Kentucky has a

significant interest in the case." (citing *Wessling v. Paris*, 417 S.W.2d 259 (Ky. 1967)).

Indeed, Kentucky courts "are very egocentric [and] protective concerning choice of law

questions." *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App.

1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994). "[I]t

is apparent that Kentucky applies its own law unless there are overwhelming interests to

the contrary." *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983).

"Kentucky law will apply to a contract issue if there are sufficient contacts and no

overwhelming interests to the contrary[.]" *Wallace Hardware*, 223 F.3d at 391 (quoting

*Harris*, 712 F.2d at 1071, which cites *Breeding v. Mass. Indem. & Life Ins. Co.*, 633

S.W.2d 717 (Ky. 1982)). "Thus, there is a strong presumption in favor of applying

Kentucky law unless [another state] has an overwhelming interest to the contrary." *Asher*,

737 F. Supp. 2d at 669 (finding location of underlying events important, finding no

countervailing "overwhelming interest" by another state, and applying Kentucky's

presumption in favor of applying Kentucky law).

Here, the suit involves piracy that occurred in Kentucky and Kentucky-domiciled

Defendants. The contract contains no choice-of-law clause. *See id.* at 671 ("The

presumption in favor of Kentucky law is all the stronger here because [the parties]

declined to include a choice of law provision in [the] contract[.]"). Plaintiff is foreign, but it chose this Kentucky forum. It appears the contract was made outside Kentucky, but Kentucky abandoned the traditional rule applying the law of the state of contract formation in *Lewis v. American Family Insurance Group*, 555 S.W.2d 579 (Ky. 1977). On these facts, and considering all the *Restatement* factors, Kentucky would apply its own law to interpret the contract. There are sufficient contacts to the Commonwealth, via the precipitating events, location of Defendants, and forum choice of Plaintiff, and no state has an overwhelming interest to the contrary. Indeed, Kentucky has the overwhelming interest in this case. Especially given the Commonwealth's strong presumption in favor of applying its own law, Kentucky law applies to interpret the J & J Sports—TR contract.

> In Kentucky,
>
> [O]rdinarily, the obligations arising out of a contract are due only to those with whom it is made; a contract cannot be enforced by a person who is not a party to it or in privity with it, except under a real party in interest statute or, under certain circumstances, by a third-party beneficiary. . . . It is well established that a third person may, in his own right and name enforce a promise made for his benefit even though he is a stranger both to the contract and to the consideration. But, not every contract will give one who is not privy thereto a right of action therein, even though such third party might have received a benefit from the completion of the contract. Only a third-party who was intended by the parties to benefit from the contract, namely, a donee or a creditor beneficiary, has standing to sue on a contract; an incidental beneficiary does not acquire such right.

*Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004) (internal quotation marks, alterations, and footnotes removed). Further,

> Kentucky courts have consistently held that it is appropriate to consider the surrounding circumstances when determining whether a party is an intended beneficiary of a contract. *See, e.g.*, *Hendrix Mill & Lumber Co. v. Meador*, 228 Ky. 844, 16 S.W.2d 482, 484 (1929) (finding a party to be a creditor beneficiary after "taking into consideration all of the facts, and in

view of the surrounding circumstances"). The intent to benefit a third party "need not be expressed in the agreement itself; it may be evidenced by the terms of the agreement, the surrounding circumstances, or both." *Olshan Found. Repair & Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009).

*Prime Finish, LLC v. Cameo, LLC*, 487 F. App'x 956, 959 (6th Cir. 2012). The Western District has described the contours of the Commonwealth's third-party beneficiary doctrine as follows:

> Generally, only a party to a contract may bring an action to enforce it. However, a third party may enforce a contract made for its "actual and direct" benefit. *Sexton v. Taylor County*, 692 S.W.2d 808, 810 (Ky. App. 1985). An actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third party beneficiary. *Id.*; *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1376 (W.D. Ky. 1987) (citation omitted). If that is the case, the third party is deemed to be an intended beneficiary of the contract, rather than merely an incidental beneficiary, who could not enforce it. Therefore, "the central issue to determining whether the contract is intended to benefit a third party is the relevant intent of the promisee who purchases the promise from the promisor." *United States v. Wood*, 877 F.2d 453, 457 (6th Cir. 1989).

*Louisville Gas & Elec. Co. v. Continental Field Sys., Inc.*, 420 F. Supp. 2d 764, 770 (W.D. Ky. 2005).

Obviously, neither Jaschkowitz nor Kawama is a third-party beneficiary here. The J & J Sports—TR contract was plainly not "made for [Defendants'] benefit." *Sexton*, 692 S.W.2d at 810 (holding third-party "had no legal right to attempt to enforce the agreement" because he "provided no hint of evidence" "tending to show that the parties made the contract for [his] benefit").[11] Quite to the contrary—there is no evidence that either J & J Sports or TR considered Jaschkowitz or Kawama (or any future pirate) in

---

[11] Further, "the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach." *Simpson v. JOC Coal, Inc.*, 677 S.W.2d 305, 307-08 (Ky. 1984) (internal quotation marks and alterations omitted).

contract consideration, and both Defendants infringed on the core broadcast right the contract conveyed. The contract contemplates no such third-parties as beneficiaries and, in fact, affirmatively establishes certain guidelines surrounding the process of suing potential infringers and pirates, as Jaschkowitz and Kawama are here.

Because the Defendants are not third-party beneficiaries of the contract, under Kentucky principles, neither Jaschkowitz nor Kawama can invoke enforcement to avoid liability here. *Presnell Const.*, 134 S.W.3d at 579. Whether J & J Sports has complied with ¶ 6 is, thus, irrelevant to resolution of this case. Any possible contract breach is a matter between J & J Sports and TR.

The Court thus respectfully disagrees with *Kurz*'s conclusion on that point. As the Court previously mentioned, the two cases *Kurz* cites, *Joe Hand Promotions, Inc. v. Conroy*, 167 F. Supp. 2d 536 (S.D.N.Y. 2001), and *Nat'l Satellite Sports, Inc. v. Marzullo*, No. 96 C 6621, 1998 WL 526570, at *2-*3 (N.D. Ill. Aug. 17, 1998), are critically distinguishable. In sum, both involve situations where the plaintiff had no underlying basis for suit. In *Conroy*, Joe Hand never received the right to prosecute infringers in New York—the State was outside the geographic scope of the contract. 167 F. Supp. 2d at 539 (holding that Joe Hand did not have standing to sue: "[T]he Agreement did not convey to plaintiff a right to prosecute commercial infringers located within New York State. Absent such a conveyance, National, not plaintiff, has the right to prosecute infringement claims in New York State."). In *Marzullo*, the agreement barred the plaintiff from suing for piracy violations. 1998 WL 526570, at *2-*3 (holding that plaintiff did not have standing to sue based on "the clear language in the license agreement barring NSS from suing for piracy violations," stating, "defendants have

raised the issue of plaintiff's standing—and courts have decided the issue—by examining the contract from which plaintiff purportedly derived its rights," and holding that "NSS effectively contracted away its standing as an aggrieved party under the Federal Communications Act").

J & J Sports faces neither circumstance here. Instead, the contract, in general, requires J & J Sports to consult, notify, and coordinate with TR; it does not bar the geographic area of Kentucky from the contract purview or foreclose an entire subject-matter category of suit. Thus, *Kurz*'s shaky foundation—based only on cases where a plaintiff attempted to enforce a contractual right it never had—erodes. Here, J & J Sports seeks to enforce a right properly within the contract, and Defendants do not qualify under Kentucky law as third-party beneficiaries to challenge the contract mechanics. They thus may not invoke the separate contract to avoid judgment.

The liability analysis is different as to individual Defendant Jaschkowitz. In general, courts distinguish between direct (or contributory) and vicarious individual liability in this context. *See, e.g.*, *J & J Sports Prods., Inc. v. Rodrigues*, No. 05CV5805(RJD), 2007 WL 1726462, at *8 (E.D.N.Y. Apr. 19, 2007) (reciting standard to prove a "contributory violation" of § 605(a) and describing "vicarious liability" as an "alternat[ive]" basis for judgment). Jaschkowitz is directly liable in his individual capacity if he "authorize[d] the underlying violations." *J & J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009); *see also, e.g.*, *J & J Sports Prods., Inc. v. Cole's Place, Inc.*, No. 3:10CV-732-S, 2012 WL 469918, at *2 (W.D. Ky. Feb. 13, 2012). There is no dispute on this record that Jaschkowitz did not directly authorize the Kawama violation. The undisputed proof indicates that Jaschkowitz

17

was not aware of the violation. Jaschkowitz submitted an affidavit swearing that he "never authorized the showing of any program by pay per view in the Kawama bar" and that he "was not in the Kawama bar on December 8, 2012 during its operating hours." DE #22-2 (Jaschkowitz Affidavit). J & J Sports does not contest this. Jaschkowitz plainly is not directly liable under § 605.

Vicarious liability, however, is a distinct matter. Jaschkowitz is vicariously liable if he had "a right and ability to supervise the violations, as well as an obvious and direct financial interest in the misconduct." *291 Bar*, 648 F. Supp. 2d at 473 (internal quotation marks removed);[12] *see also J & J Sports Prods., Inc. v. Ribeiro*, 562 F. Supp. 2d 498, 501 (S.D.N.Y. 2008) (requiring "a strong financial interest");[13] *see, e.g.*, *Kingvision Pay-Per-View, Ltd. v. Vibes Sports Bar & Café, Inc.*, No. 10-CV-127 (RRM)(ALC), 2011 WL 1331858, at *4 (E.D.N.Y. Mar. 15, 2011) (distinguishing between direct and vicarious liability and imposing individual liability because an individual being the sole principal

---

[12] This two-prong test derives from copyright law. *See Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997); *see also Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 292-95 (E.D. Pa. 2014) (analyzing the *Softel* and copyright basis for the test). District courts around the country have adopted it (or a slight variant) as the test for § 605 individual liability. Familiar liability principles from copyright law (which provide for direct, contributory, and vicarious liability) transition well to the Cable Act infringement arena. *E.g.*, *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 554 (N.D. Tex. 1997) ("Ives's ownership of 100% of the business and his position, therefore, as Ellis's employer, invested him with supervisory authority over all Webbworld operations, including the infringing activities. Even though he declined to exercise such authority, his right and ability to exercise it is sufficient for vicarious liability to attach.").

[13] District courts around the country repeat this well-established test. *See, e.g.*, *Joe Hand Promotions, Inc. v. Wright*, 963 F. Supp. 2d 26, 28 (D.D.C. 2013) (stating "a large body of cases—and, indeed, what appears to be the great weight of authority" supports the test, and citing cases); *Garden City Boxing Club, Inc. v. Extasis Corp.*, No. 07-CV-3853 (NGG)(CLP), 2008 WL 3049905, at *8 (E.D.N.Y. Aug. 1, 2008) (finding individual liability because owner "had both a right and the ability to supervise the infringing activities and a direct financial interest in the exhibition of the Event").

of the entity established the "requisite control and financial interest"); *accord J & J Sports Prods., Inc. v. Welch*, No. 10-CV-0159 (KAM), 2010 WL 4683744, at *6 (E.D.N.Y. Nov. 10, 2010) (imposing joint and several liability); *J & J Sports Prods., Inc. v. Tellez*, No. 11-CV-2823 (SMG), 2011 WL 6371521, at *3 (E.D.N.Y. Dec. 20, 2011) ("Establishing individual liability under Section 605(a) requires a showing **either** of contributory infringement, which arises when the individual authorized the violations, **or** vicarious liability, which arises when the individual had a right and ability to supervise the infringing activities and had an obvious and direct financial interest in the exploitation of the copyrighted materials." (internal quotation marks and alterations removed; emphases added)).

There is no question that Jaschkowitz satisfies prong one—that, as "owner" of Red Ruby Properties, LLC, *see* DE #22-3, at 2, 8, he had a right and ability to supervise the conduct at Kawama on the night in question. *See also* DE #22-3 (Responses to Interrogatories), at 8 (Jaschkowitz "supervised all aspects of the business."). As the owner and supervisor, Jaschkowitz plainly had the right and the ability to supervise the conduct at Kawama. *See Yakubets*, 3 F. Supp. 3d at 296 (stating owner "need not actually be supervising, because he need not know of the violative activity"); *Joe Hand Promotions, Inc. v. Rizzi*, 2013 WL 6243824, at *5 (W.D. Tenn. Dec. 3, 2013) (imposing vicarious individual liability when the defendant "own[ed] and manage[d] the Establishment, which gave him the right and ability to supervise the violations and the requisite financial interest, notwithstanding his decision not to be present during the Events").

Jaschkowitz also fits prong two. He had an obvious and direct interest in the misconduct. He was the sole owner and only member of a single-member Kentucky LLC. He stated under oath that he "supervised all aspects of the business." DE #22-3, at 8. He set the rules of the business, including, apparently, a rule designed to prevent this sort of event. *See* DE #22-2 ("I have a strict policy that this is to never be done."). Courts consistently find allegations of ownership/control and receipt of a financial benefit sufficient to establish vicarious liability. *See, e.g.*, *J & J Sports Prods., Inc. v. McAdams*, No. 14 CV 5461 (PKC)(CLP), 2015 WL 8483362, at *3 (E.D.N.Y. Dec. 9, 2015) (citing cases). Jaschkowitz evidently empowered a manager and bartender to run the establishment, and although he was not present, he surely had authority over the bar at the time of Program divulgence. As the sole owner, he had an intimate and direct stake in Kawama's finances, good and bad. An owner in his position certainly would have a financial interest in Program broadcast; Redondo and a group of friends, at least, were present in and customers of the bar specifically to watch the Program. Patrons not otherwise present appeared at Kawama to watch the Program; that is a direct and strong financial interest.

Thus, Jaschkowitz had the power and ability to supervise as to the violative acts and, per his role, had a direct stake in the bar's finances on the date in question. *See Joe Hand Promotions, Inc. v. Phillips*, No. 06 Civ. 3624(BSJ)(JCF), 2007 WL 2030285, at *3 (S.D.N.Y. July 16, 2007) (Phillips "was the principal and sole proprietor of Harlems Own, had supervisory capacity and control over its activities on the day of the fight, and received a financial benefit from them. . . . Accordingly, Mr. Phillips may be held jointly and severally liable along with Harlems Own for violating the Cable Act."). This is not

20

an assessment of culpability; it is an assessment of responsibility under § 605(a)'s strict rubric. Jaschkowitz had precisely the type of control, authority, and interest that open him to vicarious liability. The Court thus finds Jaschkowitz vicariously liable along with the LLC, under the standard, for the § 605 violation.

Finally, state immunity rules do not cloak Jaschkowitz from liability under a federal statute. *Martinez v. California*, 100 S. Ct. 553, 558 n.8 (1980) ("A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise[,] and the supremacy clause of the Constitution insures that the proper construction may be enforced."); *cf. United States v. Jones*, 542 F.2d 661, 672 (6th Cir. 1976) (expressing "substantial doubt whether a doctrine of state tort law should have any influence in defining a cause of action expressly created by federal statute"); *Haywood v. Drown*, 129 S. Ct. 2108, 2115 (2009) ("The State cannot condition its enforcement of federal law on the demand that those individuals whose conduct federal law seeks to regulate must nevertheless escape liability.").

For these reasons, as to both Defendants, the Court **GRANTS** DE #25 and **DENIES** DE #22 as to Count I of the Complaint.

*Damages*

The Court "may award damages as described in subparagraph (C)[.]" 47 U.S.C. § 605(e)(3)(B)(ii). The aggrieved party may elect either to recover actual or statutory damages. *Id.* § 605(e)(3)(C)(i). J & J Sports chose statutory damages. DE #25-1, at 13. Thus, "the party aggrieved may recover an award of statutory damages for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or

more than $10,000, as the court considers just[.]" 47 U.S.C. § 605(e)(3)(C)(i)(II). Further, "[i]n any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a) of this section." *Id.* § 605(e)(3)(C)(ii). Additionally, "[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $250." *Id.* § 605(e)(3)(C)(iii). "Plaintiff requests $5,000 in statutory damages and $17,500 in enhanced statutory damages [under (e)(3)(C)(ii)], for a total award under Section 605 of $22,500." DE #25-1, at 13.

Defendants protest that any violation was not willful. DE #28, at 4-5. They state, "Defendants did not intend for this to happen. They did not advertise the showing or make money from its showing. . . . Defendants have acted in every way known to them to prevent this situation[.]" *Id.* at 5.

"Nationwide, courts have used various methods of determining an appropriate amount of statutory damages. Some courts fashion an award by considering the number of patrons who viewed the programming, often multiplying that number by the cost if each had paid the residential fee for watching such programming. Some courts base the statutory damages amount on an iteration of the licensing fee the violating establishment should have paid the plaintiff. Other courts award a flat amount for a violation." *J & J Sports Prods., Inc. v. Brazilian Paradise, LLC*, 789 F. Supp. 2d 669, 676 (D.S.C. 2011). Regarding enhanced damages, courts consider "the need to deter this unlawful activity,"

"the purpose of the legislation[,]" and the need for "a firm judicial hand . . . to stop this predatory behavior, which is outright thievery, and to compensate the aggrieved appropriately." *Id.* at 677 (internal quotation marks omitted). Other courts look to whether "a cover was charged, . . . the program was advertised, . . . food or drink prices were increased, and . . . [the] establishment[] w[as] . . . filled to capacity." *Easterling*, 2009 WL 1767579, at *6. Courts examine a variety of factors, including "(1) the number of violations; (2) defendant's unlawful monetary gains; (3) plaintiff's actual damages; (4) whether defendant advertised for the event; and (5) whether defendant collected a cover charge on the night of the event." *J & J Sports Prods., Inc. v. McCausland*, No. 1:10-cv-01564-TWP-DML, 2012 WL 113786, at *4 (S.D. Ind. Jan. 13, 2012). Deterrence, aiming to discourage future unlawful conduct through "substantial" financial penalization, for this and future defendants is an additional important factor. *Id.*

"The Supreme Court has defined 'willful' in the context of civil statutes as conduct showing 'disregard for the governing statute and an indifference to its requirements.' *Transworld Airlines, Inc. v. Thurston*, 105 S. Ct. 613, 624 (1985)." *Easterling*, 2009 WL 1767579, at *6 n.2 (citation altered). The Court finds no willful violation in these circumstances, where there is no evidence of Program advertisement, no evidence of direct Program interception, and no indication that the Program was a prominent draw of customers on the night in question. Indeed, Keebortz averred that the karaoke music was too loud to hear the Program broadcast, and the unopposed evidence is that the violative divulgence was simply a bartender's boyfriend displaying the Program (intended for a small group of friends)—not an intentional Kawama ploy to

attract customers and produce windfall profits.[14] Jaschkowitz confirmed via affidavit that Kawama had no cable or satellite service, that he never authorized showing the Program, and that he has a strict policy against showing any pay per view programs in Kawama. DE #22-2 (Jaschkowitz Affidavit). Nothing contradicts these observations.

Ultimately, the Sixth Circuit gives district courts great discretion to calculate § 605 damages. *Eliadis*, 253 F.3d at 918 ("Although the district court did not specify precisely how it arrived at the final figure of $4,500, we conclude that the proof supports the damage calculation, that the amount is well within the statutory range, and that the award is not clearly erroneous."). The unpaid licensing fee here, per the proffered schedule, is $2,200. *See* DE #25-2 (Advertisement), at 10; *see also* DE #25-2 (Gagliardi Affidavit), at 3 ¶ 8. Applying the general factors above, the Court awards J & J Sports $3,500 in statutory damages and declines to award enhanced statutory damages,[15] for a

---

[14] A basis for an (e)(3)(C)(iii) mitigation finding may exist on this record, but Kawama does not particularly advocate for it. Regardless, the Court has incorporated the mitigative aspects of these particular facts in its final damages calculation, and (e)(3)(C)(iii) does not compel a particular damage result.

[15] Courts recognized that "a damage award based exclusively on licensing fees would undercompensate the plaintiff because the availability of unauthorized access to the program reduces demand and depresses the prices that [Plaintiff] can charge for sublicenses." *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001). Further, "[m]erely requiring [Defendant] to pay the price it would have been charged to obtain legal authorization to display the Event does nothing to accomplish this objective of the statute [deterrence of future violations]. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid." *Entm't by J & J, Inc. v. Al-Waha Enters., Inc.*, 219 F. Supp. 2d 769, 776 (S.D. Tex. 2002) (internal quotation marks removed).

Relevant factors weigh for and against increasing the award beyond the $2,200 licensing fee: Kawama charged a cover, but karaoke music drowned out the bout; the Court must deter future violations, but Defendants have reduced culpability on these facts; Redondo brought numerous patrons to Kawama to watch the Program, but there is no indication of Kawama Program advertising or that the Program was a draw for other patrons on the night in question. Ultimately, the Court sees relatively little need to deter, beyond re-enforcing Kawama's and Jaschkowitz's duty to better police the employees.

total award of **$3,500** jointly and severally against both Defendants. For the stated reasons, the Court rejects defense arguments about the requirement of interception (per *Eliadis* and § 605(a) sentence one) and the contention that §§ 605/553 require a cable or satellite component.

### Costs and Reasonable Attorney Fees

The Court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 605(e)(3)(B)(iii). The Court has determined that J & J Sports is an aggrieved party, and it has prevailed on the § 605 statutory claim in this case. Therefore, per the statute, Plaintiff is entitled to an award of full costs, including reasonable attorney fees, awarded jointly and severally against both Defendants. Per Rule 54(d), J & J Sports **SHALL** file an itemized and properly supported costs and fee claim **within 14 days**. Defendants may respond within **14 days** of J & J Sports's filing. The matter will then stand submitted.

B.   *Conversion*

J & J Sports also seeks recovery under a Kentucky state-law conversion theory. "Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another." *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849,

---

The rogue conduct should properly cost the defendants, to a degree, but the cost must reasonably reflect culpability, the scope of the violation, and all factors on-site. Both the entity and owner, based on the case particulars, have reduced culpability, and these peculiar facts only justify an award above, but not dramatically above, the licensing fee. Considering all the circumstances and factors, $3,500 fits the bill. Section 605's remedial provisions "take into consideration the degree of the violator's culpability and provide for reduced damages in those instances where the violator was unaware of the violation." *Doherty v. Wireless Broad. Sys. of Sacramento, Inc.*, 151 F.3d 1129, 1131 (9th Cir. 1998).

853 (Ky. Ct. App. 2014). "In Kentucky, a claim of conversion consists of the following

elements:

> (1) the plaintiff had legal title to the converted property;
> (2) the plaintiff had possession of the property or the right to possess it at
> the time of the conversion;
> (3) the defendant exercised dominion over the property in a manner which
> denied the plaintiff's rights to use and enjoy the property and which was to
> the defendant's own use and beneficial enjoyment;
> (4) the defendant intended to interfere with the plaintiff's possession;
> (5) the plaintiff made some demand for the property's return which the
> defendant refused;
> (6) the defendant's act was the legal cause of the plaintiff's loss of the
> property; and
> (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12

(Ky. 2005).

J & J Sports's entire discussion of its conversion claim is the following: "Plaintiff

had the exclusive commercial distribution rights over the Program, and, as such,

Defendants' interception and broadcast of the *Program* without Plaintiff's authority, as

established above, is a conversion." DE #25-1, at 12.

Kentucky courts have not addressed whether conversion applies to intangible

property, like the satellite signals or television broadcast at issue here. Most states,

however, have rejected or at least qualified intangible conversion, as do most states in the

Sixth Circuit. *See Stratienko v. Cordis Corp.*, 429 F.3d 592, 602-03 (6th Cir. 2005)

(acknowledging Tennessee's determination that "only a minority of courts recognizes

conversion of intangible property"); *Wells v. Chattanooga Bakery, Inc.*, 448 S.W.3d 381,

392 (Tenn. Ct. App. 2014) ("[A]n action for the conversion of intangible personal

property is not recognized in Tennessee."); *Sarver v. Detroit Edison Co.*, 571 N.W.2d

759, 586 (Mich. Ct. App. 1997) (only extending conversion to "the kind of intangible

rights which are customarily merged in, or identified with, some document or other tangible property");[16] *but see Eysoldt v. Pro Scan Imaging*, 957 N.E.2d 780, 786 (Ohio Ct. App. 2011) ("At common law, the general rule was that only tangible chattels could be converted. But the law has changed, and courts have held that identifiable intangible property rights can also be converted." (footnotes removed)); *see also, e.g.*, *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 809 (N.D. Ill. 2011) (dismissing a conversion claim on the grounds that "Illinois courts have not yet extended the tort of conversion to intangible property like television programming"); *DIRECTV, Inc. v. Hubbard*, No. Civ.A. 2:03CV261-P-D, 2005 WL 1994489, at *4 (N.D. Miss. Aug. 17, 2005) (concluding that Mississippi conversion does not extend to the unlawful interception of satellite transmissions). Black's defines conversion as "an act or series of acts of willful interference, without lawful justification, with *an item of property* in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." Black's Law Dictionary 356 (8th ed. 2004) (emphasis added).

In similar circumstances, the Sixth Circuit has previously affirmed dismissal and "decline[d] to extend Tennessee's law of conversion." *Intera Co., Ltd. v. Dow Corning Corp.*, 19 F.3d 19, at *4 (6th Cir. 1994) (table). Even if the Court considered J & J

---

[16] *See also D'Anna v. Furgal*, No. 320652, 2015 WL 5487927, at *2 (Mich. Ct. App. Sept. 17, 2015) ("Intangible personal property . . . can be converted, but generally only if the intangible property is in some way linked with tangible property.") Kentucky may, if the question is squarely presented, toe a similar line. *Cf. Wood v. Commonwealth*, 17 S.W.2d 443, 444-45 (Ky. Ct. App. 1929) (permitting a claim for conversion of a stock certificate as "representative of the shares[,]" acknowledging that "[t]he shares are the property converted[,]" but stating, "The certificate of stock as distinguished from the shares of stock which it represents, is not only property, but is tangible personal property.").

Sports's conversion claim legally proper under Kentucky law, Plaintiff has not proven an entitlement to relief. Specifically, J & J Sports put forward no proof, at a minimum, that Defendants "exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property[,]" that Defendants' "act was the legal cause of the plaintiff's loss of the property[,]" or that J & J Sports "made some demand for the property's return which the defendant refused" or "los[t]" the property. Defendants effectively point out these deficiencies. DE #22-1, at 8. Thus, regardless of Kentucky's posture as to intangible conversion (*i.e.*, even if the Commonwealth recognizes such a theory), faced with a cross-dispositive motion on the claim, Plaintiff fails to put forward sufficient proof to support **or** survive summary judgment on state-law conversion. On this record, the claim fails as a matter of law.[17] The Court thus **DENIES** DE #25 and **GRANTS** DE #22 as to Count III of the Complaint.

## IV.   CONCLUSION

For the foregoing reasons, and on the terms stated, the Court **GRANTS IN PART** and **DENIES IN PART** DE ##22 and 25. The Court will enter a separate Judgment.

This the 6th day of May, 2016.

---

[17] When the movants do not have the burden at trial (as Defendants here), they "may satisfy Rule 56's burden of production . . . [by] demonstrat[ing] to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp.*, 106 S. Ct. at 2557 (Brennan, J., dissenting). Defendants persuasively did that here. DE #22-1, at 7-8. The burden then shifts to the nonmovant to "call[] the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party." *Id.* J & J Sports did not do that. "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 2552.

Signed By:

_Robert E. Wier_

United States Magistrate Judge